T.C. Memo. 1998-271


UNITED STATES TAX COURT


SAMSON INVESTMENT COMPANY AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20424-96.          Filed July 27, 1998.


<u>C.F. Allison, Jr.</u>, <u>Michael V. Powell</u>, and <u>Alex D. Madrazo</u>,
for petitioner.

<u>Avery Cousins III</u>, <u>Thomas R. Lamons</u>, <u>Donna Mayfield Palmer</u>,
and <u>Sandra K. Robertson</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined the following
deficiencies in and penalties on petitioner's Federal income
taxes:

| Tax Year Ended | Deficiency | Penalty Sec. 6662(a) |
|---|---|---|
| June 30, 1990 | $2,473,392 | $98,935 |
| June 30, 1991 | 12,772,856 | 1,018,275 |

| June 30, 1992 | 11,493,555 | 911,504 |
| June 30, 1993 | 10,717,851 | 1,401,649 |

Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues for decision are:

1. Whether sections 382[1] and 383 bar the use of Continental Drilling Co.'s (CDC) net operating loss (NOL) and investment tax credit (ITC) carryforwards by Samson Investment Co. and its subsidiaries (Samson, the Samson group, or petitioner) in petitioner's taxable years ending June 30, 1990 through 1993;

2. whether drilling rigs and related equipment owned by CDC and Eason Drilling Co. (Eason) were subject to depreciation under section 167 in petitioner's taxable years ending June 30, 1990 through 1993; and

3. whether petitioner is liable for penalties for substantial understatements of its tax liability for the taxable years ending June 30, 1990 through 1993.[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are

---

[1] References to secs. 382 and 383 and the regulations thereunder are to the Internal Revenue Code and applicable regulations in effect on Dec. 31, 1986.

[2] Respondent has determined penalties only with respect to the sec. 382 and sec. 383 issues.

incorporated herein by this reference. At the time the petition was filed, Samson's principal place of business was located in Tulsa, Oklahoma.

On December 31, 1986, Samson acquired all the stock of CDC (the change of ownership). From 1981 through 1986, CDC had generated NOL's from its contract drilling business. On its consolidated Federal income tax returns for the taxable years ended June 30, 1990 through 1993, Samson deducted the NOL carryforwards generated by CDC prior to the change of ownership against other income of the Samson group.

Definitions and Industry Conditions

The operator of an oil or natural gas well has the right to drill the well. It is generally an owner of a working interest in the well and thus has an economic interest in the well. A drilling contractor usually owns one or more drilling rigs, and it contracts with an operator to drill a well. It drills a hole at a particular location to a depth specified under an agreement with the operator and typically prepares a daily drilling report of its progress in drilling the well. Often a drilling contractor acquires working interests in oil and natural gas wells in payment, or partial payment, for its drilling services or in order to generate an additional source of cash-flow to supplement its income from drilling operations.

Operators are reluctant to hire drilling contractors whose rigs have not been adequately maintained because such rigs might require extensive, costly, and time-consuming repairs during

rig-up and drilling operations. A well-maintained rig also has a higher resale value. A rig crew of 16 to 18 people is required to operate a deep well rig.

The oil and gas industry historically has ups and downs, with periods of favorable market conditions (boom periods) and unfavorable market conditions (bust periods). One boom period began in 1973 when OPEC cut oil production, increased crude oil prices approximately 70 percent, and established an embargo on oil sales to the United States. Spurred on by rising oil prices, the U.S. domestic oil and natural gas exploration and production industry achieved several years of unprecedented levels of drilling activity. As a result of rising oil and natural gas prices, Congress' authorization of the construction and filling of the Strategic Petroleum Reserve, harsh winter conditions in 1976-77, deregulation of certain deep natural gas, and record demand for oil and natural gas, oil and gas drilling activities continued to expand through the late 1970's and into the 1980's.

CDC's Organization, Business Plan, and Financing

J.D. Allen and Carl W. Swan organized CDC as an Oklahoma corporation on October 27, 1980. Messrs. Allen and Swan have a history of involvement in oil and gas activities. Edwin D. Arnold joined CDC as president at the time of its incorporation. Mr. Arnold had worked over 25 years in the oil and gas drilling business before joining CDC.

CDC engaged in the contract drilling of oil and gas wells. Initially, CDC planned to design and construct a standardized

fleet of 42 deep well drilling rigs, utilizing the most modern equipment in the industry. In 1981, CDC placed orders for the components needed to fabricate 42 rigs, at a total purchase price of $263 million. During 1981 and 1982, CDC completed fabrication of 22 drilling rigs. Drilling rigs are highly complex pieces of equipment that require extensive and frequent maintenance to remain operational. At its peak in 1981 and 1982, CDC had more than 500 employees.

To fund the construction of its new rig fleet, CDC secured purchase money financing from sellers of rig components, obtained standard bank financing, and entered into sale-leaseback arrangements. In 1981, CDC entered into transactions with Metromedia, Inc. (Metromedia), and Atlantic Richfield Co. (ARCO). CDC sold 10 of its new drilling rigs to Metromedia and ARCO and then leased the rigs from the purchasers. These lease agreements (safe harbor leases) were supported by letters of credit. Under the terms of the safe harbor leases, CDC was required to maintain its corporate existence and maintain insurance against customarily insured losses and could not dispose of substantially all of its assets.

In December 1981, CDC established a deposit account with First National Bank of Seattle (Seattle-First), as required by the letter of credit agreement related to the ARCO safe harbor lease. As the tax benefits accrued to ARCO, the amount required to secure the tax benefits declined, and funds were released to CDC (or later placed in a cash collateral account).

On August 17, 1981, CDC entered into a sale and leaseback financing transaction (the equipment lease agreement) with Greyhound Leasing & Financial Corp. (Greyhound). Pursuant to this transaction, CDC sold two rigs to Greyhound and then leased the rigs from Greyhound under capital leases which expired in 1988.

During the first quarter of 1982, CDC entered into a safe harbor lease agreement with Texas Oilfield Supply (TOS) for the sale of tax benefits on three rigs. TOS was an equipment supply company with which CDC contracted for the purchase of major components used in the fabrication of its rig fleet.

On January 26, 1982, CDC entered into a new $90 million loan agreement ($70 million term and $20 million revolving credit agreement) with Penn Square Bank, N.A., Chase Manhattan Bank, N.A., Continental-Illinois, Seattle-First, and other banks (the bank group). Pursuant to the loan agreement, CDC granted the bank group liens on and security interests in (1) 13 drilling rigs; (2) drilling equipment, drill pipe, machines and equipment; (3) CDC's inventory of parts and supplies; (4) CDC's accounts receivable from its drilling rigs; and (5) CDC's contract rights. CDC entered into a restated loan agreement with the bank group on February 1, 1983. The restated loan agreement between CDC and the bank group required CDC to maintain a cash collateral account, referred to as a special collateral account (SCA). CDC was required to deposit 75 percent of its monthly cash-flow into

this account.  The SCA also served as additional security for CDC's notes payable to the bank group.

In July 1982, CDC hired William J. West, Jr., to assist with the financial operations of CDC.  CDC authorized Mr. West to execute contracts and other instruments on behalf of CDC as necessary to conduct the business affairs of the corporation.  On October 19, 1982, Mr. West was elected financial vice president and assistant secretary of CDC.  On September 7, 1983, CDC and Mr. West entered into the first of a series of employment agreements.

CDC's Operations

Before petitioner's acquisition of CDC on December 31, 1986, CDC's main financial and accounting office was located in Oklahoma City, Oklahoma.  CDC owned and operated three rig yards located at Owentown, Texas, Victoria, Texas, and Elk City, Oklahoma.  The Owentown rig yard was the main field operations office of CDC, where Mr. Arnold maintained an office until sometime in 1986.

CDC acquired working interests in oil and natural gas properties.  CDC reported income from these working interests in the amounts of $183,408 in 1982, $68,495 in 1983, $130,900 in 1984, $60,991 in 1985, and $30,692 in 1986.

Drilling Activities

From its incorporation through July 1984, CDC drilled 48 deep wells.  CDC drilled these wells primarily in Oklahoma, Texas, and Louisiana; the wells ranged in depth from 10,000 feet

to over 20,000 feet.  CDC used each of its rigs to drill at least one well.

On April 26, 1982, CDC settled a lawsuit with Conoco, Inc., for trademark/tradename infringement.  Under the settlement, CDC agreed to engage in no business other than contract drilling for a period of 10 years.

The rigs owned by CDC at the time of the Samson acquisition were "deep well rigs", which were intended to drill wells deeper than 12,000 feet.  During drilling operations, CDC required its drilling rig crews to perform periodic maintenance on their operating rigs consistent with industry practice.

Economic Downturn

Oil and natural gas production is a high-risk business that is driven by the price that can be obtained for the oil or natural gas being produced.  The boom period of the late 1970's and early 1980's saw prices for deep natural gas soar from $1.20 per MCF (thousand cubic feet) to over $11 per MCF.  As the difference between deep gas and other gas increased, there was increased exploration for deep natural gas that resulted in a dramatically increased demand for rigs capable of drilling deep wells.

In 1982, the drilling market entered a bust period.  The price for deep natural gas produced from new wells began to drop. Deeper wells are more expensive to drill, and with the fall in the prices of oil and natural gas, operators had difficulty in paying the higher drilling rates necessary to make it economical

to drill with deep rigs. As a result of the decrease in the price of deep natural gas, the amount of exploration and drilling for deep natural gas declined sharply. The number of deep drilling contracts entered into throughout the oil and gas industry dropped rapidly. Deep well drilling activities led this decline as the price difference between deep gas and other gas narrowed.

Although there were relatively few deep wells drilled during 1986 and 1987, some operators were willing to enter into new contracts to drill deep wells, but generally only on terms that required drilling contractors to bid at rates below their actual cost or on a turnkey basis, which placed the economic risk of the drilling operation on the drilling contractors.

On November 3, 1983, CDC began drilling a well that it had taken over from another company. Due to problems encountered in drilling the well, it lost money on the job. After it completed drilling this well in July 1984, the rig was released. After July 1984, CDC drilled no wells before the Samson acquisition.

After July 1984, CDC employed no rig crews. It was standard practice in the contract drilling business to lay off rig crews when a rig was not on a contract and to rehire them when the rig returned to drilling operations. Experienced rig hands would have been readily available had CDC obtained a profitable drilling contract. CDC hired its former toolpushers and rig supervisors to provide security for its rigs in order to keep quality drilling personnel readily available to operate the rigs

when the drilling market became more favorable. All of CDC's original drilling rigs were stacked after July 1984. After the boom period of the early 1980's ended, it was industry practice for drilling companies to stack their deep rigs for long periods before they were able to use those rigs again.

Companies owning smaller rigs for use in drilling shallow wells were better suited than CDC to the demands of the market in the mid-1980's. In fact, industrywide, only 7 percent of deep rigs were working in 1986. From 1984 through 1987, there were very few drilling contracts available. During this time, wells were drilled by contractors pursuant to long-term contracts entered into before the decline or by contractors willing to drill at a loss in order to generate cash-flow and keep rigs together.

In 1982, due to industry conditions, equipment manufacturers reduced their production of new rig components. A main source for components became "used" rigs and rig equipment. Rig buyers could, and some did, generate profits by purchasing a complete rig and then reselling the components. CDC never cannibalized its rigs or sold them piecemeal; to do so would have required a large startup time before a rig could be used for drilling. There were no sales of CDC's rigs from January 1, 1986, through June 30, 1987.

Effect of Economic Downturn on CDC

On December 31, 1981, CDC had a working capital deficit of $19,207,000. As of December 31, 1981, CDC had total liabilities

of $100,357,000, including $43,859,000 owed to the bank group. Beginning in 1982, CDC was unable to meet its scheduled principal and interest payments to the bank group. On December 31, 1982, CDC was highly leveraged with a debt-equity ratio in excess of 9 to 1.

CDC's financial difficulties increased in 1982 as the demand for drilling dropped. During 1982 and 1983, CDC canceled purchases, ceased construction of additional drilling rigs, and commenced negotiations with its lenders. The decrease in CDC's cash-flow from drilling operations impeded its ability to service or refinance its bank loans, which in July 1982 totaled approximately $85 million in principal. CDC found it necessary to restructure its financing arrangements with the bank group and executed a restated loan agreement dated February 1, 1983.

In April 1983, due to cash-flow difficulties, CDC stopped making the monthly payments required under its sale and leaseback financing arrangement with Greyhound. It then attempted to restructure the terms of the Greyhound agreement. On August 30, 1983, after these attempts failed, CDC agreed to a voluntary repossession of two rigs by Greyhound.

On August 1, 1983, CIT Corp. (CIT), one of CDC's equipment lenders, foreclosed on certain equipment. CDC had defaulted on its notes to CIT in the total amount of $381,096.

By September 6, 1983, CDC realized that, because of cash-flow problems, it could not meet its October 1983 interest payment to the bank group under the restated loan agreement.

Therefore, CDC began negotiations with the bank group again to restructure and refinance its debt. On April 13, 1984, the bank group applied $3,126,316.96 of funds in the SCA to CDC's debt.

CDC's Activities After July 1984

On June 15, 1984, CDC entered into an equipment maintenance and security agreement with Mr. Arnold. Under this agreement, Mr. Arnold was responsible for the care and maintenance of CDC's 17 remaining drilling rigs and related rig equipment. The agreement required him to provide 24-hour security for CDC's drilling rigs and equipment in its Elk City and Owentown rig yards. In consideration for those services, Mr. Arnold received $19,850 per month (plus travel costs). CDC also incurred expenses for rig watch and land rent for rigs not at the Owentown and Elk City rig yards. All work under the equipment maintenance and security agreement was personally supervised by Mr. Arnold and/or his two employees, Edwin L. Arnold (Mr. Arnold's son) and Daniel Webber. The equipment maintenance and security agreement remained in effect from June 1984 through December 31, 1986.

After July 1984, CDC moved most of its rigs to the rig yards it owned. Due to the high cost of moving a rig, CDC stacked four rigs in other locations. CDC continued to provide security for its rig yards and for the rigs it did not move. Beginning on December 1, 1984, maintenance, security, and insurance expenditures on CDC's rig fleet were paid out of the SCA.

In order to reach settlements with certain creditor groups and help pay down its bank group debt, CDC needed to sell some of

its equipment and rigs.  On January 28, 1985, CDC entered into a settlement agreement with Dresser Industries, Inc. (Dresser), one of CDC' principal rig fabricators.  Pursuant to the settlement agreement, CDC and the bank group agreed to release their claims and security interests in specific equipment associated with uncompleted drilling rigs and to return the equipment to Dresser. In exchange, Dresser agreed to release its security interest in equipment that it had supplied to CDC and that had been incorporated into CDC's drilling rigs.  In addition, Dresser agreed to release CDC from all claims by Dresser against CDC's rigs.

During May 1985, CDC sold two drilling rigs to Superior Equipment and Supply Co. for $1,450,000 and $1,500,000 and transferred the sales proceeds to its creditors to reduce their claims.  These rigs were surplus to CDC's needs.  It is customary for drilling contractors to sell surplus rigs.

CDC's Bankruptcy Proceeding

On July 12, 1984, Crocker National Bank and TOS, trade creditors of CDC, filed an involuntary petition under chapter 11 of the Bankruptcy Code against CDC.  CDC converted the case into a voluntary chapter 11 proceeding (bankruptcy proceeding).

On May 30, 1986, CDC filed an amended plan of reorganization (amended plan) and an amended disclosure statement with the U.S. Bankruptcy Court for the Western District of Oklahoma (the bankruptcy court).  As a fallback provision, section 6.12 of the amended plan required that, if at the end of 5 years from the

consummation date CDC's stock had not been sold, CDC would (1) transfer any rigs that it continued to own to Chase Manhattan Bank, N.A., as agent for the bank group, in satisfaction of the bank group's secured claims, (2) liquidate its other remaining assets, and (3) distribute the proceeds of the liquidation pro rata to all creditors holding unsecured claims. Less than 6 months after the bankruptcy court entered a confirmation order, Samson purchased all of CDC's stock; therefore, no liquidation was necessary.

The amended plan provided for the issuance of stock in CDC to a trust (the shareholder trust) for the benefit of unsecured creditors. The five-member board of directors of CDC included three representatives of the bank group and one unsecured creditor. During CDC's reorganization, CDC managed its own affairs through the efforts of its own officers, Messrs. Arnold and West. The role of the bank group in the business affairs of CDC did not increase during the period of CDC's chapter 11 reorganization. The bank group would have made cash from the SCA available to CDC for drilling operations if CDC had presented them with a profitable contract. Richard D. Barton, a vice president at Seattle-First, and John F. Jerow, a vice president at Chase, agreed that the bank group would have allowed CDC to use funds in the SCA to conduct drilling operations if CDC could have obtained a profitable drilling contract.

The bankruptcy proceeding discharged CDC's debts other than the debt to the bank group. The discharge eliminated CDC's

retained earnings deficit of $55,279,302 and reduced paid-in capital by $6,404,957.

The purpose of CDC's amended plan was to ensure that its creditors received as much as possible in the ultimate sale of CDC's assets or stock.

The Samson Acquisition

Samson was created and incorporated on June 26, 1986.[3] At the time it acquired CDC, Samson, together with its affiliated subsidiaries, was a privately held diversified group of corporations. While some members of the Samson group had been involved in the oil and natural gas industry as working interest owners and operators of oil and natural gas properties, the historical businesses of the Samson group did not include contract drilling. The Samson group's practice had been to hire drilling contractors to supply the drilling rigs, drilling rig equipment, and rig crews necessary to drill the wells it operated or jointly owned.

By late 1985 or early 1986, the Samson group determined that market conditions made it an economically attractive time to examine the prospect of acquiring drilling rigs or contract drilling businesses. In 1986, rigs and rig equipment could be acquired through negotiated asset purchases, auctions, and acquisitions of drilling companies.

---

[3] On June 26, 1986, the Samson group formed Samson Investment Co. as a holding company. However, members of the Samson group had been engaged in the oil and gas business since 1971.

In early 1986, the Samson group established a consulting arrangement with Suits Drilling Co. (Suits), a drilling contractor and rig fabricator.  Over a period of years prior to the Samson acquisition, members of the Samson group, as operators of oil and gas leases, contracted with Suits for drilling services many times.  Suits was owned by Jerry Suits, Tom Dillingham, and Dan Dillingham.

In July 1986, Jerry Suits brought the possibility of purchasing CDC to Samson's attention.  Jerry Suits was familiar with CDC and CDC's business because Dillingham Insurance Agency, which was owned by Tom and Dan Dillingham, provided insurance for CDC.

Alan W. Carlton, senior vice president in charge of acquisitions and operations, led Samson's negotiations for the purchase of CDC.  Mr. West, who became CDC's president and CEO in September 1986, represented CDC in the negotiations.

At the time of the Samson acquisition, the bank group wanted to convert their CDC stock into cash as soon as possible.

On December 31, 1986, Samson purchased CDC pursuant to a stock purchase agreement and an agreement relating to assignment and partial release of security interests between the bank group and Samson.  Samson acquired 100 percent of CDC's stock for a payment of $5,201,184 to the shareholder trust.  In exchange for obtaining the release of the bank group's security interests in CDC's rigs and related equipment, Samson paid $3,098,854.40 to the bank group, other than Continental Illinois National Bank

(CINB), and agreed to transfer 5 of CDC's 15 remaining drilling rigs to CINB.

On December 31, 1986, CDC's drilling rigs had an estimated fair market value of $4,508,816, and its equipment had a fair market value of $300,000. Total liabilities of $4,508,816 were characterized as nonrecourse bank debt. The value of the property and equipment had been written down to estimated cash liquidation value. CDC had no liabilities, except the nonrecourse bank debt. CDC's liabilities, with the exception of the nonrecourse note payable to the banks, had been discharged as a result of the bankruptcy.

By purchasing CDC's stock, petitioner acquired CDC's assets and hoped to acquire CDC's "tax attributes" (primarily CDC's accompanying NOL carryforwards totaling $104,867,066).

At the time of the Samson acquisition, CDC owned: (1) Ten drilling rigs with accessories, components, parts, supplies, and tools (including drill pipe and drill collars) related thereto; (2) three rig yards (located in Elk City, Oklahoma, Owentown, Texas, and Victoria, Texas); (3) accounts receivable, including those of Good Hope Refining and Martin Exploration; (4) the ARCO deposit account with a balance of approximately $4,700,000 and interests in the ARCO safe harbor lease and related collateral account; (5) all contract rights of CDC; (6) working interests in oil and gas producing properties; and (7) miscellaneous equipment.

Immediately before the Samson acquisition, CDC had four employees:  Mr. Arnold, Mr. West, and two secretaries who provided office administration and clerical services at its Oklahoma City office.  After the Samson acquisition, H. John Rogers became the president of CDC, and Mr. Carlton served as the chairman of CDC's board of directors.

CDC and Suits entered into a service and management agreement (Suits agreement) effective December 31, 1986.  On March 29, 1989, CDC and Suits Rig Corp. (an affiliate of Suits) entered into a first amended and restated service and management agreement which retroactively amended and restated the Suits agreement, effective to December 31, 1986.  The Suits agreement provided for Suits to maintain CDC's rigs.  The Suits agreement also required Suits to use its best efforts and devote such time as might be necessary to promote utilization of CDC rigs, including marketing the rigs for contract drilling.  Suits was an independent contractor.  Suits was also a drilling contractor with significant experience in the contract drilling business.  Suits also drilled wells for the Samson group after the Samson acquisition.  From 1992 through 1996, 26 wells were drilled under a lease agreement between CDC and Suits.

Collection of Old CDC Receivables

For the first 11 months following the Samson acquisition, CDC collected $16,085 a month from Good Hope Refinery for drilling services performed by CDC in 1982.

At the time of the Samson acquisition, CDC owned a $2,600,000 account receivable from Martin Exploration for drilling done by CDC in 1982. This account receivable was ultimately settled for $37,000.

## CDC's Historic Assets

After the Samson acquisition, CDC owned three rig yards located in Owentown, Texas, Victoria, Texas, and Elk City, Oklahoma. These were the same rig yards owned by CDC before the change of ownership. In May 1987, CDC sold the Victoria rig yard for $25,309.

In November 1987, CDC sold three of its rigs to Petroleum Supply Co. for a total of $2,700,000 (approximately $900,000 per rig).

## Working Interests in Oil and Gas Properties

CDC had income from its oil and gas working interests of $11,122 and $19,014 for its taxable years ending June 30, 1987 and 1988, respectively. CDC's income from its oil and gas working interests increased to $53,803,784, $64,003,383, $32,157,221, $61,659,750, and $102,317,645 for its taxable years ending June 30, 1989, 1990, 1991, 1992, and 1993, respectively.

## Rig and Related Equipment Activities

Within 4 months after the Samson acquisition, CDC began purchasing additional rigs and drill pipe. In the first 12 months after the Samson acquisition, CDC more than doubled the size of its rig fleet by purchasing 15 rigs. CDC purchased an additional 17 rigs in 1988 and 2 more rigs in 1989.

In April 1987, CDC purchased rig No. 40, a rig constructed by Suits. CDC used rig No. 40 from July 1987 to 1989 to drill 14 wells on properties for which Sam Resource Co., a member of the Samson group, was the operator. After the change of ownership, this was the only drilling performed by CDC as the drilling contractor. Officers and employees of CDC supervised CDC's rig No. 40 drilling performed by Suits. After the change of ownership, CDC was selective in its rig acquisitions, inspecting approximately 10 rigs for every one that it purchased.

In early 1989, CDC purchased a 21-acre rig yard in Enid, Oklahoma. The Enid yard provided storage, maintenance, and security for rigs.

None of CDC's employees before the Samson acquisition remained employees of CDC after the Samson acquisition. CDC did not ask Mr. Arnold or Mr. West to continue his employment with CDC because CDC had other employees performing the work previously performed by Mr. Arnold and had access to the financial and accounting staff of Samson (so it no longer needed Mr. West). None of the former employees were necessary to continue CDC's contract drilling business.

After the Samson acquisition, CDC never obtained any drilling contracts for the deep well rigs which it had fabricated in 1981 and 1982. After CDC stacked its original deep well rigs between 1982 and July 1984, neither CDC nor any member of the Samson group used them for contract drilling.

CDC's Earnings and Petitioner's Use of CDC's Carryforwards

For the 6 months ending June 30, 1987, CDC, for financial purposes, reported total assets of $22,890,735, gross income of $2,963,940, and expenses of $3,688,840.  For the fiscal year ending June 30, 1988, CDC, for financial purposes, reported total assets of $39,069,154, gross income of $11,257,000, and expenses of $17,622,666.  For the fiscal year ending June 30, 1989, CDC, for financial purposes, reported total assets of $106,898,766, gross income of $64,731,731, and expenses of $51,828,789.  For the fiscal year ending June 30, 1990, CDC, for financial purposes, reported total assets of $138,294,807, gross income of $81,335,142, and expenses of $63,627,979.  For the fiscal year ending June 30, 1991, CDC, for financial purposes, reported total assets of $266,127,001, gross income of $140,899,602, and expenses of $106,195,409.  For the fiscal year ending June 30, 1992, CDC, for financial purposes, reported total assets of $256,382,000, gross income of $216,888,000, and expenses of $182,773,000.  For the fiscal year ending June 30, 1993, CDC, for financial purposes, reported total assets of $340,757,000, gross income of $344,612,000, and expenses of $276,147,000.

For its taxable years ending June 30, 1989, 1990, 1991, 1992, and 1993, petitioner used CDC's preacquisition NOL carryforwards to reduce its income by $6,106,243, $11,570,311, $38,001,412, $37,584,020, and $12,054,360, respectively.  The Samson group reported no taxable income for its taxable years

ending June 30, 1989 through 1992, and reduced its taxable income for its taxable year ending June 30, 1993, from $67,529,801 to $55,475,411 by using the remaining CDC preacquisition NOL carryforwards.

On its consolidated return for the taxable year ended June 30, 1993, the Samson group used CDC's preacquisition ITC carryforwards of $2,849,987.

Section 167 Depreciation

The rigs owned by CDC at the time of the Samson acquisition had been substantially depreciated before the taxable year ending June 30, 1987, and were fully depreciated before the taxable year ending June 30, 1990. On its Federal income tax returns for 1987 through 1993, CDC claimed depreciation deductions under section 167 on 34 drilling rigs and related equipment acquired by CDC after the Samson acquisition.

CDC acquired rig No. 40 in April 1987 and 33 additional rigs beginning in May 1987. CDC acquired 15 drilling rigs in 1987, 17 in 1988, and 2 in 1989.

After the change of ownership, CDC did no drilling with either the CDC rigs acquired before the Samson acquisition or with the 34 rigs acquired after the Samson acquisition, with the exception of rig No. 40, which was used to drill 14 wells from 1987 through 1989.

On August 31, 1988, Samson acquired 100 percent of Eason for $6,654,000. Through the acquisition of Eason's stock, Samson

also acquired Eason Drilling Division (Eason Division) and Crescent (Crescent Division), both operating divisions of Eason, and Crescent Pipe & Supply Co. (Crescent), a wholly owned subsidiary of Eason. Samson depreciated rigs and related equipment that it acquired through the purchase of Eason and Crescent.

Eason was organized in the 1950's and was based in Oklahoma City, Oklahoma. Eason was an independent oil and gas company that operated as a drilling contractor and had ownership interests in oil and natural gas properties. In 1977, Eason became a wholly owned subsidiary of ITT Corp. As of August 31, 1988, Eason owned: (1) Ten drilling rigs with related equipment; (2) one rig yard located in Oklahoma City, Oklahoma; (3) the inventory of Crescent Division; (4) assets, equipment, and improvements to real property relating to the operations of Eason, Eason Drilling, Crescent Division, and Crescent; (5) contract rights, including those arising from certain safe harbor leases; (6) trade receivables from unaffiliated third parties; (7) capital stock and security interests; and (8) a note receivable from Speller Oil Corp. to Crescent Division dated November 27, 1985, due and payable on December 1, 1988. Eason's 10 rigs had been used by an Eason company in drilling operations before Samson acquired Eason's stock. At the time of its acquisition, Eason had only one rig drilling a well. After it completed that well in October 1988, none of the Eason rigs were

used for drilling by petitioner.  All of the Eason rigs were subject to the Suits agreement.

In 1993, CDC was audited by the State of Texas.  Gary Golden, an auditor for sales and use tax for the State of Texas, audited CDC for its fourth quarter of 1987 and its first quarter of 1988, relative to a possible use tax liability.

Jennifer Leigh Nance audited CDC for the State of Texas Comptroller's office for the 4-year period from April 1, 1988, through March 31, 1992.  Ms. Nance proposed a sales and use tax liability against CDC because the rigs were being depreciated on petitioner's Federal income tax returns and were not in an inventory account of CDC.

In audit questionnaires in the Texas use tax proceeding, CDC described its business operations as "oil and gas drilling" in 1988 and "oil and gas operations" in 1991.

ULTIMATE FINDING OF FACT

CDC was engaged in the conduct of an active trade or business at all relevant times prior to its acquisition by Samson.

CDC continued to carry on, after December 31, 1986, substantially the same trade or business it had conducted before December 31, 1986.

OPINION

1.  <u>Sections 382 and 383</u>[4]

Section 382 provides for the elimination of NOL carryovers of a corporation if a qualifying change in the ownership of the stock of the corporation is accompanied by the failure of that corporation to continue carrying on substantially the same trade or business as it conducted before the change of ownership. Neither party contests that there was the required change of ownership. The only question to be resolved, therefore, is whether CDC carried on substantially the same trade or business under section 382(a)(1)(C).

Respondent claims that section 382 applies because petitioner's drilling business was dormant for 2 years before the acquisition.[5] Alternatively, if CDC was in an active business

---

[4] The parties agree that our resolution of the sec. 382 issue will also resolve the sec. 383 issue.

[5] Sec. 1.382(a)-1(h)(6), Income Tax Regs., provides in part:

> (6) A corporation has not continued to carry on a trade or business substantially the same as that conducted before any increase in the ownership of its stock if the corporation is not carrying on an active trade or business at the time of such increase in ownership. Thus, if the corporation is inactive at the time of such an increase and subsequently is reactivated in the same line of business as that

(continued...)

before the acquisition, respondent contends that CDC did not carry on substantially the same trade or business after the change of ownership.  See sec. 382(a)(1)(C).  Petitioner claims that CDC was, at all relevant times, in the contract drilling business.  In support thereof, petitioner claims that CDC was in a state of readiness and that any inability to obtain profitable drilling contracts was temporary and due to the severe downturn in the contract drilling economy.  The resolution of this issue therefore turns on whether there has been a change in CDC's business or a break in the continuity of business activity.

A.  <u>Continuity of Business Activity</u>

Section 382(a)(1)(C) precludes the carryforward of NOL's of an acquired loss corporation where the loss corporation has not "<u>continued to carry on</u> a trade or business" substantially the same as that conducted before the acquisition.  (Emphasis added.) Respondent argues that implicit in this section is the requirement that the acquired corporation must have been engaged in an <u>active</u> trade or business at the time of the acquisition.

---

[5](...continued)
originally conducted, the corporation has not continued to carry on a trade or business substantially the same as that conducted before such increase in stock ownership.  * * *

In support thereof, respondent cites section 1.382(a)-1(h)(6),

Example (1), Income Tax Regs., which provides:

> Example (1).  X Corporation is engaged in the
> business of manufacturing and selling machinery.  On
> January 1, 1958, the corporation suspends its
> manufacturing activities and begins to reduce its
> inventory of finished products because of general
> adverse business conditions and lack of profits.
> During the period between January 1 and September 1,
> 1958, the business of the corporation remains dormant.
> On September 1, 1958, A, an individual, purchases at
> least 50 percent in value of X Corporation's
> outstanding stock.  On October 1, 1958, the corporation
> begins to manufacture the same type of machinery it
> manufactured before January 1, 1958.  The reactivation
> of the corporation in the same line of business as that
> conducted before January 1, 1958, does not constitute
> the carrying on of a trade or business substantially
> the same as that conducted before the increase in stock
> ownership.

This Court, however, has recognized that in some situations, a

company may be temporarily inactive and still satisfy the

requirements of section 382.  See Clarksdale Rubber Co. v.

Commissioner, 45 T.C. 234 (1965); H.F. Ramsey Co. v.

Commissioner, 43 T.C. 500 (1965).  Thus, the question becomes

what degree of activity is necessary to sustain the

characterization of "active trade or business."

Our issue is therefore factual.  If we conclude that

petitioner permanently ceased all business operations before the

change of ownership, then it was engaged in no business at the

time of the change, and therefore CDC could not "continue" to

carry on substantially the same "trade or business".  See <u>Glover Packing Co. v. United States</u>, 164 Ct. Cl. 572, 328 F.2d 342, 349 (1964).  If, however, we conclude that CDC was merely temporarily inactive or simply maintaining a low profile with the intent to resume contract drilling when economically possible, then CDC would be able to "continue" to carry on substantially the same trade or business.  See <u>Six Seam Co. v. United States</u>, 524 F.2d 347 (6th Cir. 1975).

We have considered a break in operations of a corporation for reasons that indicated the resumption of operations was reasonably to be anticipated to be a "temporary" ceasing of operations and not a cessation of the conduct of the corporation's regular trade or business.  See <u>Clarksdale Rubber Co. v. Commissioner</u>, <u>supra</u>; <u>H.F. Ramsey Co. v. Commissioner</u>, <u>supra</u>.  In <u>H.F. Ramsey Co. v. Commissioner</u>, <u>supra</u> at 504, we found:

> As jobs were completed by * * * [the taxpayer], its equipment, when not needed on other jobs, was brought to * * * [taxpayer's] equipment yard where it was reconditioned.  Many pieces of equipment were sold for the best price available without sacrifice and the proceeds from the sale were used to discharge the loan from Wachovia Bank & Trust Co.  Ramsey's primary aim at this time was to complete contracts in progress and to do everything necessary and possible to discharge all of * * * [taxpayer's] debts and liabilities.

Although the acquired company in H.F. Ramsey "was pretty much of a shell corporation, [it] was not a shell immediately prior to the negotiations for sale.  It was a viable corporation which had been actively engaged in the road construction business but which was temporarily inactive."   Id. at 516.  Although the Court found that the taxpayer in H.F. Ramsey was acquired with the principal purpose of avoiding Federal income taxes in violation of section 269, we also found that the taxpayer continued to carry on, after the acquisition, substantially the same trade or business conducted before the acquisition.  The U.S. Court of Appeals for the Sixth Circuit stated in Six Seam Co. v. United States, supra at 353:

> the correct standard in determining whether such limited activity amounts to continuing a trade or business under the statute is whether it evidences only an intent to wind up corporate affairs, or whether instead the company is simply maintaining a low profile with an intention to resume operations should the business climate improve.

The regulations support the construction that a temporary break in operations which is not intended to be permanent is not to be considered as "not carrying on an active trade or business."  See sec. 1.382(a)-1(h)(6), Example (2), Income Tax Regs.

Mr. Arnold and Mr. West both testified that in 1986 CDC maintained its rigs in a state of readiness for immediate return to active drilling when the contract drilling market turned around. Maintenance was performed at a cost of approximately $20,000 per month. Maintenance was performed to keep CDC's rigs in condition to return to active drilling in a matter of days if the market for deep drilling improved.

In 1986 and through the time of the change of ownership, CDC owned all assets necessary for a contract drilling business. CDC had 15 rigs and related equipment, drill pipe, three rig yards, and working interests in oil and gas properties. This is in marked contrast to the taxpayer in United States v. Fenix and Scisson, Inc., 360 F.2d 260, 268 (10th Cir. 1966), in which the court stated that the "attempt to sell nearly all of * * * [Oronogo's] equipment is incompatible with the idea that it was merely standing by intending to resume operations should business factors improve." In Fenix and Scisson, Inc., the acquired company (Oronogo) had attempted to sell between 80 and 90 percent of its assets more than 3 years before the acquisition. The court found that "Had they been completely successful in selling equipment, they would have been unable to resume operations short of repurchasing necessary equipment. We hardly believe Congress

intended [section] 382(a) to turn on such a fortuitous circumstance." Id. Additionally, in that case, Oronogo filed articles of dissolution more than 2 years before the acquisition. The attempted sale of nearly all of Oronogo's assets along with the filing of articles of dissolution evidenced an intent to conduct no further business operations that is not present in the instant case.

At all relevant times, CDC was trying to reorganize and resume its contract drilling business. CDC made no attempt to liquidate its assets. In 1986, CDC was operating its rig yards, maintaining administrative offices, managing its working interests in gas wells, maintaining insurance, and complying with the terms of its safe harbor leases. CDC employed experienced management employees: Mr. Arnold, who was in charge of the operations of CDC, and Mr. West, who handled CDC's finances. Mr. Jerow and Mr. West testified that officers of CDC--rather than the bank group--were managing CDC's business affairs in 1986.

At all times prior to the change of ownership, CDC filed its Federal and State income tax returns and Oklahoma franchise tax returns, which reported that CDC was in the contract drilling business. Cf. Utah Bit & Steel, Inc. v. Commissioner, T.C. Memo. 1970-50 ("A further indication of lack of intent to continue

business operations is the fact that petitioner did not even pay its franchise tax.").

CDC's lack of business in 1984 resulted from adverse business conditions. William Glass, the former president of Big Chief Drilling Co., a competitor of CDC, testified that as long as a drilling contractor owned rigs, it could be in the drilling business. Jerry Suits, president of Suits, and Charles Hinton, the former president of W.B. Hinton Drilling Co., both testified that there were instances when their own deep drilling rigs were not drilling, but their companies remained in the drilling business. Additionally, Dr. Preston L. Moore, one of petitioner's expert witnesses, testified that, during the years leading up to the change of ownership, "These rigs were being maintained in a state of readiness to drill. People were out trying to get contracts. The contracting business goes on. The fact that the rigs aren't working does not mean the business is not an ongoing business." CDC always intended to remain in the contract drilling business. Mr. Arnold testified that CDC always intended to be in the contract drilling business and never intended to get out of that business.

Furthermore, under the facts here present, the filing of a petition in bankruptcy does not indicate that CDC meant to cease

business operations.  When CDC entered bankruptcy, the record indicates that there was every intention to continue its operations.  Cf. Utah Bit & Steel, Inc. v. Commissioner, supra. Throughout CDC's chapter 11 reorganization, Mr. West actively worked on behalf of CDC trying to collect receivables, negotiating with CDC's creditors, and managing CDC's litigation.

We are convinced that at all relevant times, CDC was ready, willing, and able to drill wells if profitable drilling contracts became available.  CDC's drilling rigs were maintained in a state of readiness for drilling.  Unemployed rig hands were readily available for employment on the rigs.  CDC also had working capital for conducting drilling operations.  The funds in CDC's SCA were available for these operations.  As of June 30, 1986, the balance in the SCA was $6,279,000.  Mr. Barton testified that the bank group would have allowed CDC to use these funds if a profitable contract had been obtained.

Considering all the facts of record, we find that there was a continuation of business by CDC at the time of the change of ownership.[6]  Having concluded that section 1.382(a)-1(h)(6),

---

[6] We note that petitioner contends that respondent is collaterally estopped from arguing that CDC was not engaged in an active trade or business because the bankruptcy court confirmed CDC's plan of reorganization.  Respondent contends that the

(continued...)

Income Tax Regs., does not apply here, we look to the factors mentioned in section 1.382(a)-1(h)(5), Income Tax Regs., to determine whether CDC continued to conduct substantially the same trade or business after its acquisition by petitioner.[7]

B.  Substantially the Same Trade or Business

Section 382 by its terms does not require a corporation to continue exactly the same trade or business.  "[I]t would seem there could be some changes in the manner of conducting * * * [the] trade or business and yet the business could remain 'substantially the same.'"  Goodwyn Crockery Co. v. Commissioner, 37 T.C. 355, 362 (1961), affd. 315 F.2d 110 (6th Cir. 1963).  On the other hand, the regulations and the legislative history state that the discontinuance of any except a minor portion of the

---

[6](...continued)
principles of collateral estoppel do not apply in this situation and that petitioner did not plead collateral estoppel, and therefore petitioner cannot raise the issue on brief.  Petitioner counters that the issue of collateral estoppel has been tried by consent within the meaning of Rule 41(b)(1) and, in the alternative, has filed a Motion for Leave to File Amendment to Petition to include the issue of collateral estoppel.  We have found that petitioner continued to carry on a trade or business prior to the change of ownership, and therefore the issue is moot.  Petitioner's motion for leave to amend the petition will be denied.

[7]  The relevant periods for making this determination are the taxable year of the acquisition and the following taxable year.  Sec. 382(a); Princeton Aviation Corp. v. Commissioner, T.C. Memo. 1983-735; sec. 1.382(a)-1(a)(1), Income Tax Regs.

taxpayer's business may constitute the necessary change in a trade or business.  S. Rept. 1622, 83d Cong., 2d Sess. 285 (1954); sec. 1.382(a)-1(h)(7), Income Tax Regs.

The test under section 382(a) is an objective one with specific factors to be considered along with any other relevant item in determining whether a corporation has continued to carry on a trade or business substantially the same as that conducted before a change of ownership.  Section 1.382(a)-1(h)(5), Income Tax Regs., provides as follows:

> (5)  In determining whether a corporation has not continued to carry on a trade or business substantially the same as that conducted before any increase in the ownership of its stock, all the facts and circumstances of the particular case shall be taken into account. Among the relevant factors to be taken into account are changes in the corporation's employees, plant, equipment, product, location, customers, and other items which are significant in determining whether there is, or is not, a continuity of the same business enterprise.  These factors shall be evaluated in the light of the general objective of section 382(a) to disallow net operating loss carryovers where there is a purchase of the stock of a corporation and its loss carryovers are used to offset gains of a business unrelated to that which produced the losses.  However, the prohibited utilization of net operating loss carryovers to offset gains of a business unrelated to that which produced the losses is not dependent upon considerations of purpose, motive, or intent, but rather is established by the objective facts of the particular case.  The principles set forth in this subparagraph shall be applied in accordance with the rules set forth in the following subparagraphs of this paragraph.

Respondent contends that, if CDC was in an active business prior to the change of ownership, the trade or business of CDC after the change was not substantially the same as that conducted prior to the acquisition. Respondent's primary argument in support thereof is that CDC was not in the contract drilling business but rather acquired assets at depressed prices to be resold at a profit.

Respondent points to Clare Co. v. Commissioner, T.C. Memo. 1969-264, in which the taxpayer contended that it was "a viable corporation, ready, willing and able and attempting to conduct the same type of business it was engaged in prior to the change in stock ownership." The facts of Clare Co. are distinguishable from those of the instant case. In Clare Co., the taxpayer, prior to the change of ownership, was in the construction business. After the change of ownership, the taxpayer sold all of its construction equipment and bought river barges. The taxpayer then rented out these river barges with the resulting rental income accounting for 89 percent of its gross income for the year after the change. CDC on the other hand maintained the necessary equipment, including drilling rigs, rig yards, and related rig equipment, so that at all times during the relevant

periods, had the contract drilling economy improved, it could have used its rigs as a contract driller.

We have determined that CDC was in the contract drilling business prior to the change of ownership. Therefore, to be entitled to deduct the NOL's, it follows that CDC must have continued in the contract drilling business after the change of ownership. In H.F. Ramsey Co. v. Commissioner, 43 T.C. at 514, we reviewed the legislative history of section 382 and concluded that "it would appear that there has to be a real change in the type of business conducted to come within * * * [the] statute." Accord Clarksdale Rubber Co. v. Commissioner, 45 T.C. 234 (1965); Goodwyn Crockery Co. v. Commissioner, supra. Both before and after the acquisition, CDC's operations are best described as a contract drilling operation.

The facts in the record indicate that had CDC been in the business of buying and selling rigs, as respondent contends, CDC would have operated in a substantially different manner. After the change of ownership, CDC continued to maintain its rigs to keep them in a state of readiness for drilling. Had CDC been trying to sell its rigs, the maintenance would have been lower cost and more cosmetic in order to enhance the visual appeal of

- 38 -

the rigs.[8]  Additionally, companies in the rig selling business used manufacturers' representatives to do the maintenance so the representative could provide certificates to a prospective purchaser with independent verification that the equipment was operational.  CDC did not hire equipment manufacturers' representatives but rather performed its own maintenance work.

Companies that were in the business of selling drilling rigs maintained offices in Houston because buyers from around the world came to Houston to shop for drilling rigs.  CDC never opened an office in Houston.  CDC located its rigs in remote areas in Oklahoma and Texas where the demand for drilling would occur.

CDC would have advertised the sale of its rigs in trade publications.  CDC never advertised in any trade publication that specialized in advertising rig sales in order to sell any of its rigs.

CDC would not have acquired trucks and forklifts because it would have been cheaper to hire a trucking company to move the rigs and equipment only one time before they were sold.

---

[8]  It was more expensive to maintain rigs in a state of readiness than it was to maintain them for resale.

The Suits agreement would not have been entered into because Suits' personnel were primarily experts in drilling operations and not in marketing drilling rigs and equipment for resale.

CDC continued to market its rigs for drilling and to maintain them in a state of readiness so that CDC could drill with them profitably if the market improved.

CDC continued to own two of the three rig yards that it owned prior to the change of ownership. CDC continued to use the same name and logo that were used prior to the change of ownership. CDC continued to own and maintain all of its working interests in producing wells.

Respondent emphasizes the fact that CDC had over 500 employees at its peak and only four employees just prior to the change of ownership. The relevant comparison, however, is the number of CDC employees just before the change compared with the number of employees after the change of ownership. Due to the economic conditions at the time, CDC was able to run the business with only four employees just prior to the change of ownership. Petitioner established that had CDC been able to acquire profitable contracts, CDC easily could have hired experienced rig crews at that time. When CDC drilled 14 wells after the acquisition, it was able to contract with Suits to provide the

necessary rig crews.  After considering the record as a whole, we find that CDC continued substantially the same trade or business after the change of ownership as that conducted prior to the change of ownership.

C.  Conclusion

Based on all the facts and circumstances, we find that during the relevant periods CDC was engaged in the contract drilling business.  Thus, the limitations of sections 382 and 383 are not triggered.

2.  Section 167

Respondent argues that petitioner improperly claimed depreciation deductions for assets of CDC and Eason held as inventory for resale.[9]  Petitioner contends that it devoted all of the assets it depreciated to the contract drilling business.

Section 167(a) allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in a trade or business, or property held for the production of income.  Section 1.167(a)-2, Income Tax Regs.,

---

[9]  The depreciation issue relates only to rigs and equipment that CDC purchased after the change of ownership and to the Eason rigs and equipment.  The parties do not contest the bases of the assets.

provides that the depreciation allowance "does not apply to inventories or stock in trade".

The period for depreciation begins "when the asset is placed in service".  Sec. 1.167(a)-10(b), Income Tax Regs.  Section 1.167(a)-11(e)(1)(i), Income Tax Regs., provides in relevant part:

> The term "first placed in service" refers to the time the property is first placed in service by the taxpayer, not to the first time the property is placed in service.  Property is first placed in service when first placed in a condition or state of readiness and availability for a specifically assigned function
> * * *

This and other courts have recognized that taxpayers may claim depreciation deductions under the so-called idle asset rule in situations where the asset involved, while not in actual use during the year in issue, nevertheless was devoted to the business of the taxpayer and ready for use should the occasion arise.  See P. Dougherty Co. v. Commissioner, 159 F.2d 269 (4th Cir. 1946) (for purposes of determining whether depreciation was allowable for years when barges lay idle for protracted periods during a 20-year period, it was sufficient that they were kept in usable condition and were ready for use should the occasion arise), affg. 5 T.C. 791 (1945); Kittredge v. Commissioner, 88 F.2d 632 (2d Cir. 1937); Piggly Wiggly Southern, Inc. v.

Commissioner, 84 T.C. 739, 745-746 (1985), affd. 803 F.2d 1572

(11th Cir. 1986); Clemente, Inc. v. Commissioner, T.C. Memo.

1985-367.  In Kittredge v. Commissioner, supra at 634, the court

said:

> To read the phrase "used in the trade or business" as
> meaning only active employment of property devoted to
> the business would lead to results which we cannot
> believe Congress intended.  For example, one factory of
> a large industrial plant may lie idle for a year, and
> in fact suffer depreciation as great, or greater, than
> that sustained by the factories in operation.  To allow
> no depreciation for the idle factory would be most
> unfair to the taxpayer, for he must claim the deduction
> in his tax return for the year when the depreciation
> occurs, and may not take it in a later year. * * *
> Hence we think the phrase should be read as equivalent
> to "devoted to the trade or business"; that is to say,
> that property once used in the business remains in such
> use until it is shown to have been withdrawn from
> business purposes.  * * *

In Piggly Wiggly Southern, Inc. v. Commissioner, supra, we

set forth the requirements for application of the "idle asset

rule" (i.e., that assets may be "placed in service" when not yet

in actual use but in a state of readiness and available for a

specifically assigned function).  We identified two necessary

factors:  (1) The taxpayers already were engaged in the business

for which they purchased the equipment, and (2) the taxpayers did

all that was in their power to place the equipment into service.

We have already found that CDC was in the contract drilling

business.  Furthermore, Eason was in the contract drilling

business and used each of its rigs to drill wells prior to the

years at issue.  Thus, the first factor is satisfied.  We must

therefore decide whether petitioner did all that was in its power to place the rigs at issue into service.

All of the CDC and Eason rigs were subject to the Suits agreement. Both John Rogers and Jerry Suits testified that during the taxable years at issue, both CDC and Eason owned fleets of drilling rigs that they held as part of their drilling business.

Respondent points to a Texas sales and use tax audit of 12 of the rigs in question, in which Samson argued that the rigs were not subject to Texas use tax because it purchased them for resale. This, however, was merely one of several alternative arguments asserted by petitioner in the use tax audit. In audit questionnaires in the Texas use tax proceeding, CDC described its business operations as "oil and gas drilling" in 1988 and "oil and gas operations" in 1991. Additionally, petitioner and the State of Texas have agreed to defer to this Court for resolution of this issue. If we determine that CDC is allowed depreciation deductions, then it will be liable for Texas use tax.

In Sears Oil Co. v. Commissioner, 359 F.2d 191 (2d Cir. 1966), affg. in part, revg. in part and remanding T.C. Memo. 1965-39, the taxpayer purchased a canal barge that it was unable to use until the following year because the canal froze. The court found that the taxpayer was entitled to depreciation in the year of purchase because (1) the barge was gradually deteriorating as it was "subject to the weather elements", (2)

the freezing of the canal was "not a condition which the taxpayer desired to bring about", and (3) "depreciation may be taken when depreciable property is available for use 'should the occasion arise,' even if the property is not in fact in use." Id. at 198. In arriving at this finding, the court noted that the taxpayer was already in the business for which the depreciable asset had been purchased.

Property, once used in business, remains in such use until it is shown to have been withdrawn from business purposes. P. Dougherty Co. v. Commissioner, supra. Petitioner's rigs were available for drilling, though it was unable to obtain profitable contracts. Petitioner did not withdraw the rigs from business use. On this evidence, we hold that petitioner's use of the rigs was such that depreciation deductions are allowable.

Petitioner has prevailed on the sections 382 and 383 issues; therefore, the issue of whether petitioner is liable for substantial understatement penalties is moot.

To reflect the foregoing,

An appropriate order will be issued, and decision will be entered under Rule 155.